# In the United States Court of Federal Claims

BID PROTEST

|  |  |  |
|---|---|---|
| RICE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 26-109C |
| v. | ) | (Filed Under Seal: March 26, 2026. |
| | ) | Corrected Version Reissued for |
| THE UNITED STATES, | ) | Publication: April 13, 2026)* |
| | ) | |
| Defendant, | ) | |
| | ) | |

<u>Aron Caraway Beezley</u>, Bradley Arant Boult Cummings LLP, Washington, DC, with whom were <u>Nathaniel J. Greeson</u>, <u>Jenna R. Mazzella</u>, and <u>Eugene J. Benick</u>, for Plaintiff.

<u>Corinne A. Niosi</u>, U.S. Department of Justice, Washington, DC, with whom were <u>Patricia M. McCarthy</u> and <u>Brett A. Shumate</u>, for Defendant. <u>Todd Watson</u>, U.S. Army Legal Services Agency, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

On January 16, 2026, Plaintiff Rice Services, Inc. ("Rice"), filed a protest with the Government Accountability Office ("GAO") to challenge the Department of the Army's decision to award KBR Services, LLC ("KBR") a task order to provide cook and dining facility attendant support at the Cadet Mess at the United States Military Academy at West Point. AR Tab 7. When a GAO protest is filed, the Competition in Contracting Act ("CICA") imposes an automatic stay on contract awards that lasts for the duration of the protest. However, in this case, the Army invoked its authority to override the CICA stay in accordance with 31 U.S.C. § 3553(d)(3)(C). AR Tab 23 at 393. The Army found that (1) performance of the contract was in the best interests of the United States, and (2) urgent and compelling circumstances that significantly affect the interest of the United States would not permit waiting for a decision from GAO. AR Tab 23 at 389 (citing 31 U.S.C. § 3553(d)(3)(C)(i)).

Rice contends that the Army's decision to override the automatic stay was arbitrary and capricious and contrary to law. Compl. at 3, ECF No. 1. It requests that the Court declare the override void, enjoin the Army from implementing the override while Rice's GAO protest is

---

\* Pursuant to the Protective Order, ECF No. 10, this Opinion was initially filed under seal on March 26, 2026, and the parties were afforded fourteen days to propose redactions. The parties did not propose any redactions. However, the government requested correction of a reference in the Opinion to the Army Federal Acquisition Regulation Supplement. The Court agrees that the citation of the Supplement was in error. It has corrected the Opinion to eliminate the reference.

pending, and enjoin the Army from awarding any contract for cook and dining facility attendant support services at West Point absent full and open competition. Id. at 25.

The case is currently before the Court on the parties' cross-motions for judgment on the administrative record ("MJARs"). For the reasons set forth below, the Court finds the Army's decision to override the CICA stay was neither arbitrary and capricious nor contrary to law. Rice's Motion for Judgment on the Administrative Record, ECF No. 22, is therefore **DENIED**, and the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 25, is **GRANTED**.

## BACKGROUND

### I.    Overview of Cadet Mess Operations at the United States Military Academy

The United States Military Academy at West Point ("USMA," "West Point," or "the Academy") is the oldest of the country's five military service academies.[1] Its mission is "[t]o build, educate, train, and inspire the Corps of Cadets to be commissioned leaders of character committed to the Army values and ready for a lifetime of service to the Army and Nation."[2] Cadets who complete the prescribed course of instruction at West Point receive a Bachelor of Science degree and may be appointed a second lieutenant in the Army upon graduation. 10 U.S.C. § 7453.

Each year, West Point is home to approximately 4,400 Cadets. AR Tab 32 at 425. It is the Academy's policy to require Cadets to take all breakfasts and lunches, as well as Thursday dinners, at Washington Hall (also known as "the Cadet Mess").[3] At these mandatory meals, Cadets sit at assigned tables where their food is served "family style." Id. The Army chooses to serve food family style "to ensure everyone is fed quickly and to foster a sense of unit cohesion." AR Tab 32 at 428.[4]

Because of their packed and regimented schedules, Cadets are afforded only 35 minutes for breakfast and lunch and 45 minutes for dinner to "enter, perform customs, eat, and depart." AR Tab 32 at 427–28; Day in the Life of a Cadet, supra note 3 (outlining daily schedules starting with breakfast at 6:55–7:30 AM and ending with "Athletics Time" between 4:10–5:45 PM followed by dinner at 6:30–7:15 PM). The Academy therefore places a premium on efficient and speedy service at the Cadet Mess. The Cadet Mess prepares three meals for each Cadet every day, which amounts to over 13,000 daily meals. AR Tab 32 at 425. During these mandatory meals, the entire Cadet Corps is fed at once, requiring enough food to feed 4,400 Cadets to be

---

[1] U.S. Military Academy at West Point, U.S. Army, https://www.goarmy.com/careers-and-jobs/find-your-path/army-officers/military-academy (last visited March 26, 2026).

[2] About West Point, West Point, https://www.westpoint.edu/about (last visited March 26, 2026).

[3] See Day in the Life of a Cadet, West Point, https://www.westpoint.edu/cadet-journey/day-in-the-life (last visited March 26, 2026).

[4] During optional meals (i.e., weekend meals and weekday dinners other than Thursday) food is served "buffet style." See AR Tab 32 at 428.

prepared and made ready to serve at a single, specific time. See AR Tab 32 at 427–28.[5]

## II.    Staffing Difficulties

The USMA itself does not provide staffing for the Cadet Mess. AR Tab 32 at 425. Instead, Cadet Mess kitchen staff are employed by the Army Sustainment Command ("ASC"), specifically the Logistics Readiness Center-West Point, which is solely responsible for food service support at the Cadet Mess. Id. The Cadet Mess has historically relied upon civilian employees of the Army to staff all back-of-house operations, i.e. the kitchen. See id. at 425–26.[6] The front-of-house wait staff, on the other hand, is supplied through a contract that is currently held by Rice. Pl.'s MJAR at 3; AR Tab 9 at 65.

There are eighty-eight federal positions allocated to perform back of house functions at the Cadet Mess. AR Tab 32 at 426. These positions include cooks and other food service workers. See, e.g., id. at 427. Eighty-six of the positions are allocated to civilian employees, and two are held by active-duty service members. Id. at 426.

The Mess Hall has suffered from a "chronic shortfall-staffing situation" in recent years. Id. That situation has been exacerbated by competition for workers in the local labor market, as well as a series of initiatives and policies whose express purpose has been to thin the ranks of the federal workforce. Id. These include the Secretary of Defense's hiring freeze of civilian employees and the so-called "Deferred Resignation Program," as well as a "furlough period at the beginning of [fiscal year] 2026." Id.[7]

Specifically, on January 20, 2025, the President issued a memorandum which "order[ed] a freeze on the hiring of Federal civilian employees, to be applied throughout the executive branch." Memorandum on Hiring Freeze, 2025 WL 477920, 2025 Daily Comp. Pres. Doc. 141 (Jan. 20, 2025). The memorandum prohibited agencies from "[c]ontracting outside the Federal Government to circumvent [its] intent." Id.[8]

---

[5] There are also three ancillary locations at West Point that provide food and beverages for Cadets, but these locations are "not intended to be used as an alternative source of daily food service." AR Tab 32 at 425. Cadets must pay out of pocket at these locations, while food at the Cadet Mess is funded by military appropriations. Id. There are additional restaurants located near West Point that are not directly associated with the Academy. Day in the Life of a Cadet, supra note 3 (mentioning local Starbucks and Subway locations).

[6] The Army has active-duty cooks, but their priority mission is to provide services at deployed and field locations "rather than the garrison environment of the USMA." AR Tab 32 at 425.

[7] In its Mission Impact Statement, the Army referred to the "furlough period at the beginning of CY 2026." AR Tab 32 at 426. The Court assumes, however, that its intent was to reference the furloughs that occurred as a result of the government-wide shutdown at the beginning of fiscal (not calendar) year 2026.

[8] The federal hiring freeze has been extended multiple times and will apparently continue indefinitely. See Memorandum on Extension of Hiring Freeze, 2025 WL 1633684, 2025 Daily Comp. Pres. Doc. 496 (April 17, 2025) (extending the hiring freeze through July 15, 2025);

The Secretary of Defense was initially responsible for implementing the hiring freeze at all military departments. See Off. of the Sec'y of Def., Immediate Civilian Hiring Freeze for Alignment with National Defense Priorities (Feb. 28, 2025) ("Effective immediately and for the duration of this freeze, no vacant civilian position may be filled, and no new civilian positions may be created, unless approved by [the Secretary of Defense]."). The memorandum that implemented the freeze stated that the Secretary would "consider exemptions for positions essential to immigration enforcement, national security, and public safety, and positions which support such functions." Id. The Secretary later delegated that authority to the Secretaries of the Military Departments "after review by the Under Secretary of Defense for Personnel and Readiness" but specified that "[t]his authority may not be further delegated." Off. of the Sec'y of Def., Guidance Regarding the Department of Defense Civilian Hiring Freeze (Mar. 14, 2025).

Originally, consistent with the Presidential Memorandum of January 20, 2025, the Secretary of Defense expressly prohibited the use of contract services to "circumvent the hiring freeze." Off. of the Sec'y of Def., Immediate Civilian Hiring Freeze for Alignment with National Defense Priorities. However, pursuant to Executive Order 14,222, the Secretary later issued further guidance on hiring and contracting, which permitted the "[employment of] contractor support to augment existing efforts where workload demands exceed current civilian capacity." AR Tab 17 at 111 (citing Off. of Sec'y of Def., Implementation of Executive Order 14222 – Department of Government Efficiency Cost Efficiency Initiative (May 27, 2025)).

In the meantime, in addition to the freeze on filling vacant positions, efforts were underway across the executive branch to encourage incumbent employees to resign. In particular, on January 28, 2025, the Office of Personnel Management sent a mass email to the entire federal workforce bearing the subject line "Fork in the Road." See Citizens for Responsibility and Ethics in Washington v. U.S. DOGE Service, 769 F. Supp. 3d 8, 14 (D.D.C. 2025). It purported to offer employees the "choice" of remaining in their positions (albeit without "assurance regarding the certainty of [their] position or agency") or of resigning and "retain[ing] all pay and benefits . . . until September 30, 2025."[9]

These policies adversely affected staffing levels for back-of-house functions at the Cadet Mess. The hiring freeze prevented the Army from hiring additional civilian employees for at least ten months. See AR Tab 8 at 56, 60 (noting that, as of November 7, 2025, the Army still did not have hiring authority); AR Tab 32 at 427 (showing hiring had not been completed as of January 16, 2026). Additionally, six employees left the Cadet Mess as part of the deferred resignation program. Id. at 426. As a result of these and other factors, while 73 of 88 positions (82%) in the Cadet Mess were filled as of January 2024, that number fell to 68 (77%) by January 2025, 62 (70%) by November 2025, and, most recently, to 61 (69%) by January 2026. Id.

The Army attempted to address these challenges, largely without success. For example,

---

Memorandum on Ensuring Accountability and Prioritizing Public Safety in Federal Hiring, 2025 WL 2306538, 2025 Daily Comp. Pres. Doc. 753 (July 7, 2025) (extending the hiring freeze through October 15, 2025); Exec. Order No. 14,356, 90 Fed. Reg. 48387 (Oct. 15, 2025) (extending the hiring freeze indefinitely).

[9] Original Email to Employees, OPM, https://www.opm.gov/fork/original-email-to-employees (last visited March 26, 2026).

in the period of time after the Department of Defense instituted its January 2025 hiring freeze, ASC requested and secured Exceptions to Policy that have resulted in the approval of Requests for Personnel Actions covering 21 of the 27 vacancies across four positions. Id. However, because a significant number of the "new" hires involved the promotion of existing staff (as opposed to outside applicants) these personnel actions themselves will create new vacancies and result in only a limited net gain of employees. Id. at 426–27.

The Army has also attempted to address the staffing shortfall by requiring civilian employees at the Cadet Mess to work overtime and through their breaks. Id. at 428. Since June 1, 2025, the Cadet Mess has averaged 98 overtime hours per week, a 40% increase from the overtime utilized in the previous year. Id. at 426. The Army has also employed surge support from ancillary Cadet Mess support areas, including the administrative office, warehouse, food preparation, and bakery departments. Id.

These extraordinary efforts enabled the Cadet Mess to prepare and serve meals on time despite the severe shortage of kitchen staff. Id. at 428. Nonetheless, the increased demand that employees work overtime and the use of surge support from other areas have had negative consequences. Support staff cannot perform their regular duties while assigned to work the Cadet Mess. Id. In addition, due to the increase in the frequency and length of overtime assigned to existing staff, "[t]he current supervisors of the Cadet Mess workforce report that the morale of their employees is significantly harmed" and that "[m]ultiple employees have expressed to their supervisors that they are prepared to resign because of the increased hours they have been working." Id.

It also bears noting that because all 4,400 Cadets must be fed at once to avoid disrupting their schedules the Cadet Mess does not use overtime to extend shift lengths. Id. at 426. Instead, overtime is used to augment staff during existing shifts. These individuals must perform assigned tasks in a compressed period of time, which leads to "rushed performance and fatigue," thereby increasing "safety risks in the kitchen area." Id. "Lack of personnel also reduces oversight to ensure proper steps are taken for hygiene and food safety – for example employees washing hands after touching raw meats and moving to another food preparation task." Id.

### III.    The Initial Sole-Source Contract and GAO Protest

The challenges the Army faced in staffing the Cadet Mess with civilian employees ultimately led it to explore the feasibility of using the procurement process to augment the staff with contractors, at least temporarily. To that end, in November 2025, the Army entered a sole-source contract with Southern Foodservice Management, Inc. ("Southern"). AR Tab 8 at 58, 62. The stated purpose of the contract, which had a one-year performance period and a November 12 start date, was "to fulfill an urgent need for Cook Support & Dining Facility Attendant [] augmentation support at the United States Military Academy." Id. at 58.

The Army sought to justify the sole-source award to Southern on the grounds that it was "the only vendor with the requisite knowledge and capabilities to perform the cook support [dining facility attendant] services on short notice at West Point." Id. at 58–59. The Army reasoned that competition was not feasible in the timeframe needed to bring on a contractor, asserting that "Army cook support [dining facility attendant] services requirements generally require a procurement administrative lead time [] of at least 235 days." Id. at 59.

5

On November 21, 2025, Rice filed a protest of the sole-source award with GAO. AR Tab 11. On December 19, the Army advised GAO that it intended to take corrective action by terminating the sole-source contract and conducting a new competitive procurement. AR Tabs 38–39. GAO then dismissed Rice's protest as academic on December 22, 2025. AR Tab 40.

## IV.  The Second Sole-Source Award and GAO Protest

Before conducting a new competitive procurement, the Army—still facing staffing shortages—awarded another sole-source contract to Southern in January 2026. AR Tab 17 at 110, 116. It again reasoned that "recruitment [of new employees] w[ould] take time" and "[a] competitive action [was] not possible for this requirement due to the short timeline to procure the services needed" and due to the estimated 235 days of procurement administrative lead time. Id. at 111, 113. This second sole-source contract had a shorter performance period than the first one: three months with a single one-month option period. Id. at 110.[10]

Southern began supplying staff under the second contract on January 5, 2026. See id. at 116; AR Tab 32 at 426. The following day, Rice filed a second protest with GAO. AR Tab 18. Shortly thereafter, the Army requested that the protest be dismissed and advised GAO that it had stopped work on the contract and intended to terminate it. AR Tab 35 at 729. The Army explained that it was going to "reassess . . . the current acquisition strategy" and that "after this review," it would "procure the needed services in accordance with the reassessed acquisition strategy." Id. Based on these representations, GAO dismissed Rice's second bid protest as academic on January 14, 2026. AR Tab 36 at 731–32.

## V.  The Task Order, Pending GAO Protest, and CICA Stay Override

As promised in response to Rice's second protest, the Army terminated the second sole-source contract with Southern and reevaluated its acquisition strategy. Based on its study of available options, the Army determined that it could procure short-term support services for the Cadet Mess by issuing a task order against an existing indefinite delivery, indefinite quantity ("IDIQ") contract vehicle—the "LOGCAP" contract. AR Tab 41a at 740–43.[11] The task order, which provides for a base period of performance of four months and two four-month options, requested one project manager, one equipment and administration specialist, five lead cooks,

---

[10] Planning for the award of the second sole-source contract appears to have begun in December, while the first GAO protest was still pending. See AR Tab 17 at 108 (showing the Justification and Approval for Other than Full and Open Competition document was prepared by the contracting officer on December 9, 2025). However, it was not finally approved until January 5, 2026. Id. at 116.

[11] The Logistics Civil Augmentation Program, or LOGCAP, is a "regulatory program" to quickly provide the "full spectrum" of "logistics support services" for Department of Defense facilities around the world. Army Reg. 700-137 ¶¶ 1-1, 3-2; see also AR Tab 31 at 418 (providing examples of agencies and facilities where LOGCAP services were employed).

fourteen cook II's, and six dining facility attendants. Id. at 740; AR Tab 41b at 800. It was issued to KBR which, in turn, subcontracted the work to Southern. AR Tab 32 at 427.[12]

On January 16, 2026, Rice filed a third GAO protest, this time challenging whether the task order issued to KBR was within the scope of the LOGCAP contract. AR Tab 7 at 36–54.[13] The protest triggered an automatic stay of performance. AR Tab 23 at 388 (Determination and Findings ("D&F")). However, on that same day, the Army issued a memorandum pursuant to 31 U.S.C. § 3553(d)(3)(C) and FAR 33.104(c), overriding the automatic stay and authorizing KBR to continue performance. Id. at 387–93.

In the D&F, Major General Douglas S. Lowrey, Head of Contracting Activity, stated that an override of the stay was warranted because it was both "in the best interest of the United States" and "necessary due to urgent and compelling circumstances that significantly affect the interests of the United States, specifically the health, life, and safety of West Point cadets." Id. at 389 (first citing 31 U.S.C. § 3553(d)(3)(c)(i)(I)–(II); and then citing FAR 33.104(c)(2)(i)–(ii)); see also id. at 388 (stating that the Cadet Mess's operation "directly impact[s] [Cadets'] physical well-being, fitness for training, and ability to perform their duties"). He concluded that "[t]he Army cannot continue to suspend performance . . . and await the 100 days for the GAO to issue a decision because doing so would jeopardize the continuity of essential food service operations for the entire Corp of Cadets." Id. at 388. He also found that "[a]side from the LOGCAP [] award, [the Army] has exhausted all available options to meet this urgent requirement and there are no other contract vehicles through which it can be met." Id.

## VI.    This Action

Rice filed the present action challenging the Army's override of the automatic CICA stay on January 20, 2026. Compl. On February 3, 2026, Rice filed a Motion for Judgment on the Administrative Record. Pl.'s MJAR, ECF No. 22. The government filed a Cross-Motion for Judgment on the Administrative Record on February 9, 2026. Def.'s MJAR, ECF No. 25. Briefing on the cross-motions was completed on February 13, 2026. Pl.'s Reply, ECF No. 26; Def.'s Reply, ECF No. 27. The Court heard oral argument on the cross-motions on February 25, 2026.

## DISCUSSION

## I.    Jurisdiction and Standard of Review

This Court has jurisdiction to review agency stay override decisions under 28 U.S.C. § 1491(b)(1), which empowers the Court of Federal Claims "to render judgment on an action by an interested party objecting to," among other things, "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." See RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999). Reviews of stay override

---

[12] According to the Army, "LOGCAP is a performance based contract, and no direction was given to KBR to subcontract with Southern." AR Tab 31 at 417.

[13] Rice had also filed an agency-level protest on January 13, 2026. AR Tab 1 at 1–16. However, because it subsequently filed the GAO protest, the agency-level protest was dismissed. AR Tab 6. The GAO protest remains pending.

decisions are conducted on the basis of the administrative record and not on a "new record made initially in the reviewing court." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)).[14]

When reviewing stay override decisions, the court applies the standards used to evaluate agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4). Under those standards, the court's job is to determine whether the agency's decision to go ahead with a contract award, notwithstanding the pendency of a GAO protest, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

This standard of review is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). It requires a reviewing court to sustain an agency action where it "evince[s] rational reasoning and consideration of relevant factors." Id. (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (stating the court's scope of review is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion'" (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994))). A disappointed offeror "bears a 'heavy burden'" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1333 (quoting Saratoga, 21 F.3d at 456).

The Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). It may set aside an agency's action only where the agency either "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

---

[14] Along with its cross-motion for judgment on the administrative record, the government has submitted declarations from several Army officials that supply greater detail regarding certain facts set forth in the Agency's D&F and related existing administrative record. See Def.'s MJAR App. at 1–14, ECF No. 25-1. The government has not moved to supplement the administrative record with those declarations. Nor is it apparent to the Court that such supplementation would be appropriate. The Court is, however, permitted to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); see, e.g., Bannum Inc. v. United States, 404 F.3d 1346, 1352 n.2 (Fed. Cir. 2005) (taking judicial notice of Office of Federal Procurement Policy policy letter). In this case, the Court takes judicial notice of certain facts regarding Cadet life and Cadet Mess information found on West Point's public website. See Day in the Life of a Cadet, West Point, https://www.westpoint.edu/cadet-journey/day-in-the-life (last visited March 26, 2026). It does not consider the information contained in the declarations the government submitted with its motion.

## II.    Stay Override Standards

Under the Competition in Contracting Act, performance on a contract is automatically stayed when a party lodges a protest of the award with GAO. 31 U.S.C. § 3553(d)(3)(A) (stating that if an agency "receives notice of a protest," then "the contracting officer may not authorize performance of the contract to begin while the protest is pending" or, if performance has already begun, "the contracting officer shall immediately direct the contractor to cease performance under the contract"). This stay of performance remains in effect until the earlier of GAO's resolution of the protest or the expiration of 100 days—the statutory deadline for GAO to issue its decisions. Id. §§ 3553(d)(3)(A)–(B), 3554(a)(1).

"The overarching goal of the stay is to preserve competition in contracting and ensure a fair and effective process at the GAO." Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25, 31 (2006) (citing PGBA, LLC v. United States, 57 Fed. Cl. 655, 660 n.8 (2003)). The stay "preserve[s] the status quo during the pendency of the protest so that an agency would not cavalierly disregard the GAO's recommendation to cancel the challenged award." Id. at 30–31 (citing PGBA, 57 Fed. Cl. at 660 n.8).

At the same time, however, the statute recognizes that in some situations there are government interests in moving forward with a contract award that outweigh these important policies. CICA reserves to agencies the discretion to override the automatic stay of contract performance in two circumstances: (1) where "performance of the contract is in the best interests of the United States" or (2) where "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C)(i).[15]

Although a stay override may be justified based on the satisfaction of either of these criteria, the decision regarding which criterion applies has practical consequences for a successful protester. If a stay is overridden because performance is in the "best interests of the United States" and GAO upholds the protest, GAO must make recommendations regarding corrective action "without regard to any cost or disruption from terminating, recompeting, or rewarding the contract." 31 U.S.C. § 3554(b)(2). On the other hand, GAO may take the cost and disruption of corrective action into consideration if the stay was overridden under the more stringent "urgent and compelling circumstances" standard. Cf. id.

## III.    The Reilly's Wholesale Factors

In this case, the Army found that both criteria for overriding the stay of the contract award were satisfied. It based the finding on its application of the so-called "Reilly's Wholesale" factors, which are derived from the analytical framework for justifying stay overrides set forth in Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006). That decision identified "a variety of factors" which it said an agency "must consider" when it decided whether to override at stay on the basis of "urgent and compelling circumstances." 73 Fed. Cl. at 711. As described in greater detail below, those factors are: (1) whether significant adverse consequences will necessarily occur if the stay is not overridden; (2) whether reasonable alternatives to the override

---

[15] In the pre-award context, a stay of the award can be overridden only in the latter circumstance; a finding that the performance of the contract is merely "in the best interests of the United States" is not sufficient. See 31 U.S.C. § 3553(c)(2).

exist that would adequately address the circumstances presented; (3) how the potential cost of proceeding with the override, including the costs associated with the potential that the protest might be sustained, compare to the benefits associated with the approach being considered for addressing the agency's needs; and (4) the impact of the override on competition and the integrity of the procurement system, as reflected in CICA. Id.

The assertion that an agency "must consider" the four factors, however, is not correct. The agency must engage in rational decision making that takes into consideration relevant information. But basing its analysis on the Reilly's Wholesale factors does not "comprise an indispensable aspect of agency rational basis." See Safeguard Base Operations, LLC v. United States, 792 F. App'x 945, 948–49 (Fed. Cir. 2019) (citing Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 992 (Fed. Cir. 2018)). Nor is this Court obligated to employ the Reilly's Wholesale factors in conducting its review of a stay override decision. Id.

Moreover, the Reilly's Wholesale factors were developed for use in reviewing whether a stay override is justifiable only under the "urgent and compelling circumstances" criterion. See Reilly's Wholesale, 73 Fed. Cl. at 711. That criterion has also been held to require that—absent an override of the stay—a "threat of immediate harm to health, welfare or safety" would exist. See Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 387 (2013) (quoting PMTech, Inc. v. United States, 95 Fed. Cl. 330, 345–46 (2010)); see AT&T Corp. v. United States, 133 Fed. Cl. 550, 556 (2017); Fisher Sand & Gravel Co. v. United States, 143 Fed. Cl. 247, 253 (2019); Karna, LLC v. United States, No. 25-2024C, at 136, ECF No. 43 (2026).

A determination that a stay override is in the "best interests of the United States" provides an independent and less demanding basis for overriding a CICA stay, and at least some of the Reilly's Wholesale factors appear not well-suited for reviewing a "best interests" determination. See Dyncorp Int'l LLC v. United States, 113 Fed. Cl. 298, 302 n.4 (2013) (opining that the Reilly's Wholesale factors "overstate[] what is required by the arbitrary and capricious standard particularly in the context of a 'best interest' justification" and declining to require a showing that "significant adverse consequences" would "necessarily occur" if the stay were not overridden).

Nonetheless, the Army used that analysis as the basis for its conclusion that both criteria for overriding the stay had been met. See AR Tab 23 at 389. The Court will therefore consider the Army's application of the Reilly's Wholesale factors to the facts of this case, in conducting its review under the arbitrary and capricious standard.

### A.    Consequences of Not Overriding the Automatic Stay

#### 1.    The Army's Findings

As noted, the first Reilly's Wholesale factor requires consideration of "whether significant adverse consequences will necessarily occur if the stay is not overridden." 73 Fed. Cl. at 711. The Army's conclusion that this criterion was met was rational and supported by the administrative record.

The record reflects that by November 2025, the Army concluded that it could no longer rely exclusively on civilian federal employees to staff back-of-house functions. See AR Tab 8 at 58–60. In its view, the longstanding shortage of kitchen staff had reached critical levels that were

no longer sustainable. Approximately 30% of the positions allocated to perform the kitchen work were vacant, requiring the extensive use of overtime and surge support. AR Tab 32 at 426.

The Army had concluded that this reliance on overtime and reassignment of other employees to compensate for the critical shortages of kitchen staff "[came] with unsustainable negative consequences impacting the remaining workforce as well [as the] health, life and safety of West Point cadets." AR Tab 23 at 389–90. The Army explained that requiring kitchen staff to routinely work overtime, particularly on a compressed schedule, leads to "low morale, employee burnout and absenteeism." AR Tab 32 at 426. These were more than abstract concerns. "Multiple employees" had told their supervisors that they were "prepared to resign because of the increased hours they have been working." Id. at 428. The Army understandably was concerned that if the employees followed through on their stated intent, it would only "exacerbate the current staffing problems." Id.

The Army also explained that the increasing requirements that employees work overtime was not merely demoralizing but also led to "rushed performance and fatigue," thereby "increas[ing] safety risks in the kitchen area." Id. at 426. The shortage of staff also made it more difficult to provide the oversight needed "to ensure proper steps are taken for hygiene and food safety – for example employees washing hands after touching raw meats and moving to another food preparation task." Id.

The Court cannot say that the Army's concerns about these risks lacked a rational basis. To the contrary, they seem eminently reasonable. The Court therefore defers to the Army's judgment regarding the extent to which the staffing shortfall created intolerable risks to the health and safety of the kitchen staff as well as the Cadets.

Nor was it irrational for the Army to conclude that, absent immediate action to secure additional staff, it might no longer be able to maintain the Academy's strict schedule. The Agency explained that Cadet schedules are "grueling" and "combine intense academic study with rigorous physical training." Id. at 427. Because of their demanding schedules, Cadets require nutritious meals and "have only a brief time to enter, perform customs, eat, and depart" during mandatory breakfasts and lunch. Id. The Army reasonably concluded that the 30% vacancy rate in kitchen staff positions was making it increasingly difficult for the Cadet Mess to safely accomplish its mission of supplying 4,400 Cadets with nutritious meals at least twice a day and within only a brief period of time.

### 2. Rice's Arguments

In its motion, Rice challenges the Army's judgments regarding the seriousness of the threat posed to the health and welfare of the Cadets if it were prevented from contracting out back-of-house functions during the pendency of the GAO protest. It argues that the Army's concerns regarding staffing were "speculative" and that "[t]he Court should treat these purported risks with the same urgency the Army itself has shown over the past two years—that is, none." Pl.'s MJAR at 18. Rice notes that there have been staffing shortages at the Cadet Mess since at least January 2024, but the Army did not attempt to contract for additional kitchen staff until November 2025. Id. In fact, according to Rice, instead of addressing the staffing shortages, the Army pursued policies which exacerbated staffing issues. See id. (noting that six of the seven employees who resigned in 2025 were prompted to do so by the government itself); Pl.'s Reply at 1–2 (observing that "[w]hile the Army sought exceptions to the hiring freeze for additional

11

Cadet Mess staff, the majority of those exceptions were for internal promotions rather than new hires" and that "[a]t the same time, the Army allowed certain Cadet Mess staff to opt into the [deferred resignation program] and prematurely depart their positions").

However, the claim that the Army has not shown sufficient "urgency" in addressing the inadequate staffing at the Cadet Mess is belied by the record. The Army sought and ultimately secured exceptions to the hiring freeze, but its ability to reduce the number of vacant positions by hiring new staff was hampered by "competition with the local labor market" and the rules governing federal hiring. AR Tab 32 at 426–27. For example, the Army apparently received fewer applications from qualified candidates than ideal. See id. ("The individuals who were not selected [to fill Food Service Worker vacancies] have adverse performance records or have otherwise previously quit work at the USMA."). In addition, current employees applied for some of the vacancies and, because of their experience, were hired to fill them, rendering the positions they left behind vacant. See id.[16]

By November 2025, the difficulties the Army was experiencing using the federal hiring process to staff the Cadet Mess led it to decide that it was time to explore other options. From that point on, the Army has consistently and diligently attempted to address the staffing shortfall. The Agency twice announced its intent to contract out the work to Southern on a temporary and sole source basis. AR Tabs 8, 17. Then, after Rice filed protests of both awards, the Army—recognizing the continuing urgency of its need to identify the most defensible contracting vehicle—reassessed its strategy. That reassessment led to its decision to employ the LOGCAP task order to temporarily address the staffing shortage. AR Tab 41a.

Thus, the record reflects the Army's continued effort to address the staffing shortage through a variety of methods. And, in any event, even if the Army could have acted sooner in 2025 to initiate the procurement process, it is not clear to the Court why that would be relevant to whether—at the time it overrode the CICA stay—that action was in the best interests of the United States and/or necessary due to urgent and compelling circumstances. Nor does Rice's argument address the fact that the staffing shortfall has grown more severe and has had increasingly negative effects on remaining staff. See AR Tab 32 at 426 (noting that the use of overtime increased from 2024 to 2025 by 40%, even before losing employees in November to the deferred resignation program).

Finally, the Court is not persuaded by Rice's argument that the Army has not established the staffing shortfall will have "dire consequences" within the next 100 days. Pl.'s MJAR at 20. The Army is not required to wait for the situation to become "dire" before overriding the stay. As explained above, the Army made a reasonable judgment that the staffing shortage had reached a critical point creating an untenable risk of mission failure. The Court must defer to the Agency's rational judgment.

---

[16] Rice argues that in hiring existing personnel to fill vacancies, the Army "chose to reshuffle existing personnel, and forgo new hires." Pl.'s MJAR at 19. But there is no evidence in the record that the Army turned away qualified outside candidates so that it could instead promote candidates from within.

### B.    Reasonable Alternatives to Overriding the Stay

#### 1.    The Army's Findings

Having found that "significant adverse consequences would necessarily occur" if the stay were not overridden, the Army turned to a consideration of whether there existed reasonable alternative options it might employ to avoid having to override the stay of performance on the task order during the pendency of the GAO protest. It concluded that there were not. It reasoned that there were "no viable alternative locations where the Cadets may go to receive adequate daily nutrition" within the USMA campus. AR Tab 32 at 428. And, it explained, there were no "practical means by which the Cadets could be transported off the facility for food services that would not also cause unacceptable interruption of their training and classes." Id.

Moreover, the Army reasoned, "[f]inding alternative locations" for Cadets to eat their meals "would be fundamentally unnecessary and duplicative of the costs of operating the Cadet Mess." Id. "Adequately staffing the Cadet Mess with the necessary labor to feed the Cadets," it explained, "is the only cost- and time- effective means in which to achieve the USMA's mission to care for and develop the next generation of Army officers." Id. Indeed, "[t]here has been no additional need for overtime or surge support since [Southern] resumed work" on January 12, 2026. Id. at 426.

The Court notes that the administrative record shows that the Army had previously considered and rejected other alternatives in preparing its justification for the second sole-source contract to Southern. It explained that neither Meals-Ready-to-Eat (commonly known as MREs) nor Unitized Group Rations (or UGRs) were viable alternative sources of sustenance. AR Tab 17 at 112. The Army also ruled out using military culinary specialists, the AbilityOne Program, and certain other existing contracts for staffing support. Id. at 112–13.

#### 2.    Rice's Arguments

Rice takes issue with the Army's finding that there were no reasonable alternatives to the LOGCAP task order that would prevent the harms the Army anticipated. According to Rice, these alternatives included: entering a contract with Rice; changing its method of organizing overtime shifts; continuing to use surge support; calling on the National Guard, Reserves, or active-duty cooks; adjusting West Point's mealtimes and overall schedule; conducting an interim procurement; conducting a procurement to a small business; and obtaining catering services. Pl.'s MJAR at 21–26.

However, the Army explicitly considered and rejected several of these options. It rejected the option of entering a contract with Rice because, while it needed the services immediately, Rice could only promise to provide them within 30 days. AR Tab 23 at 390; AR Tab 31 at 422. In addition, the Army was not confident in Rice's ability to meet its needs. Rice's most recent experience providing cook support services was in 2017—nearly nine years earlier. AR Tabs 9–10 at 63–69. The Army considered Southern the "only vendor with the requisite knowledge and capabilities to perform the cook support [dining facility attendant] services on short notice at West Point." AR Tab 8 at 58–59. It also inquired into whether it could use active-duty cooks, at least temporarily, but determined that they were not available. AR Tab 32 at 425.

In addition, as described above, the Army not only considered, but actually conducted, two interim procurements, both involving sole-source awards to Southern that were intended as

stop-gap measures while a competitive procurement was planned and conducted. Rice itself protested the sole-source awards, and, as a result, the Agency terminated them. See AR Tab 31 at 422 ("[A]s a result of Rice's multiple successive protests, . . . [USMA] has exhausted all available options to meet this urgent requirement while the remainder of the long-term [] contract is being competed and there are no other contract vehicles through which this requirement can be met."). Similarly, the Army had been using overtime and surge support for months and explicitly determined that their continued use was unsustainable for the reasons set forth above. AR Tab 32 at 428.

Moreover, an agency is not required and cannot be expected to consider any and all alternatives a protestor conjures up after the fact. See PMTech, 95 Fed. Cl. at 352. That the Army did not explicitly consider, for example, calling in the National Guard or a caterer to supply more than 13,000 meals every day does not reflect arbitrary and capricious decision making. Agencies are only required to consider reasonable alternatives. And Rice has failed to identify a reasonable alternative that the Army did not consider.

In short, the Court is satisfied that the Army gave adequate consideration to whether there were reasonable alternatives to the override of the CICA stay that would have sufficiently met its needs. It is also satisfied that the Army acted within its discretion when it determined that there were not.

### C.      Costs of Overriding the Stay in the Event that GAO Sustains Rice's Protest

#### 1.      The Army's Findings

The third Reilly's Wholesale factor concerns "how the potential cost of proceeding with the override, including the costs associated with the potential GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs." 73 Fed. Cl. at 711. The Army concluded that the benefits of overriding the stay included the provision of immediate staffing support and the receipt of up to 100 days of LOGCAP services, which would avoid the significant adverse consequences detailed above. See AR Tab 32 at 427–28. These benefits, it found, "greatly outweighed" the costs it might incur if Rice's protest was successful. AR Tab 23 at 390.

#### 2.      Rice's Arguments

Rice objects to the Agency's analysis on a variety of grounds, none of which the Court finds persuasive. Rice contends that the Army could not have taken the cost of performance under the LOGCAP task order into consideration because at the time it decided to override the stay, there was not yet any agreement as to what those costs would be. Pl.'s MJAR at 26–27. But this observation is not entirely accurate because the Army placed a $1 million cap on the task order. AR Tab 41a at 740. It therefore did know the maximum amount it might have to pay on the task order, which it took into consideration when it calculated the benefits of overriding the stay, as compared to the costs it might incur if the GAO protest were successful.

Rice also points out that while the Army acknowledged that there existed a risk that it would have to pay Rice's protest costs if the protest were sustained, it did not explicitly mention termination costs. Pl.'s MJAR at 26. But the Army did consider costs it would face if Rice's protest prevailed and there is nothing in the record suggesting that termination costs would be significant. Moreover, the Army did not rely upon a quantitative analysis of costs as a basis for

overriding the stay. See Superior Helicopter LLC v. United States, 78 Fed. Cl. 181, 193 (2007) ("Given that the Forest Service's override decision did not rely on the quantitative costs associated with that decision, that the administrative record is silent on quantitative costs generally, and that the termination and transition costs do not qualitatively appear to be significant, the fact that the Service's findings lacked quantitative calculations of costs is not itself problematic.").

Finally, an agency is entitled to deference in its assessment of whether the benefits afforded by overriding the stay outweigh the risks of additional costs attendant to a successful GAO protest. STG LLC v. United States, 147 Fed. Cl. 790, 809 (2020) ("The court defers to the Army's conclusion about the acceptable risk to the Army if STG's protest is successful."). In this case, the Army assessed the risk that it would incur additional costs as result of a successful protest as relatively insignificant when measured against the benefits of going ahead with performance on the task order during the pendency of the GAO protest. The Court has no reason to second-guess this judgment.

### D.      Effect on Competition and Integrity of the Procurement System

The last factor the Army considered was the extent to which overriding the stay would affect competition or the integrity of the procurement system. AR Tab 23 at 390. It concluded that going forward with the task order while GAO considered Rice's protest would not materially affect either interest. Id.

The Army reasoned that the task order was a "short-term solution" that it expected to employ only for four months. Id. During those four months, the Army would hold a competition for the contract. Id. That competitive procurement is currently underway. See Def.'s Reply at 18.[17] These actions did not undermine competition; they promoted it.

Rice argues the Court should consider how the Army's conduct with respect to the procurement as a whole (as opposed to just the stay override) impacted competition and the integrity of the procurement system. It contends, among other things, that it was misleading for the Army to twice represent to GAO that it intended to take corrective action by terminating the sole-source contracts and holding a competition for a contract award when, in fact, it ultimately decided to instead use the LOGCAP task order, which again resulted in an award of the work to Southern as KBR's subcontractor. Pl.'s MJAR at 28–33.

Rice's arguments are unpersuasive. The record reflects that by November 2025, the Army had concluded that it could no longer rely on civilian employees to staff the Cadet Mess and that it would need to turn to other options. AR Tab 8 at 59. It initially believed that the best course would be to secure necessary additional staff by contracting out the work to Southern on a sole-source basis. Id. at 62. However, it reconsidered that strategy after Rice filed two protests with GAO. AR Tab 23 at 388. It then determined that it could issue a LOGCAP task order to

---

[17] The Army issued a competitive solicitation on February 6, 2026, and intends for performance to begin on May 8, 2026. See Contract Opportunity, Cook Support and Dining Facility Attendant (DFA) West Point USMA, NY, SAM.gov, https://sam.gov/workspace/contract/opp/39e5200af83f4765afd430d8c07c27dd/view (last visited March 26, 2026).

KBR, and KBR independently subcontracted the work to Southern. AR Tab 31 at 423; AR Tab 32 at 427.

Rice's arguments that the Army's actions were misleading or betrayed a lack of candor are not supported by the record. There is no evidence showing that the Army's procurement strategy was intended to steer the work to Southern—much less the kind of "irrefragable" proof needed to rebut the presumption that government officials act in good faith in the discharge of their duties. See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)). Indeed, Rice concedes as much when it expressly states in its motion that it is "not arguing anyone in the Army was operating in 'bad faith' with an intent to hurt it specifically." Pl.'s MJAR at 30 n.13.

Nor does the record support Rice's related accusation that the Army's actions were intended to "strong-arm a small business by forcing it through protest after protest in the hope that it will eventually give up." Pl.'s MJAR at 39. Rather, the Court's sense is that the Army faced a staffing crisis at the Cadet Mess and was attempting in good faith to identify and employ the most defensible contract vehicle available to address it for a short period of time until it could hold a competitive procurement.

In short, the Army acted reasonably and in good faith when it concluded that the temporary use of the LOGCAP task order did not adversely affect competition or the integrity of the procurement system.

## CONCLUSION

For the reasons set forth above, the Court concludes that the following findings by the Army were not arbitrary and capricious nor contrary to law: (1) that continued performance of the LOGCAP task order during the pendency of Rice's GAO protest was in the best interests of the United States; and (2) that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of GAO. Rice's Motion for Judgment on the Administrative Record, ECF No. 22, is therefore **DENIED**, Rice's Motion for a Temporary Restraining Order, ECF No. 2, is **DENIED**, and the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 25, is **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

16